THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DONALD THOMAS SCHOLZ,

                Plaintiff,

    v.

FRAN MIGLIACCIO (aka FRAN COSMO)
and ANTHONY MIGLIACCIO (aka
ANTHONY COSMO),

                Defendants.

Case No. 2:13-cv-01229 JLR

**DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

**NOTE ON MOTION CALENDAR:
AUGUST 16, 2013**

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION
Case No. 2:13-cv-01229 JLR

127776.0001/5781057.3

# I. INTRODUCTION

Fran and Anthony Migliaccio (aka Fran and Anthony Cosmo, the "Defendants") hereby oppose Plaintiff's Motion for a Preliminary Injunction.  Plaintiff fails to demonstrate, as he must, that he is likely to prevail on the merits, that he will suffer irreparable harm, that the balance of the equities tips in his favor, and that an injunction is in the public interest.  Plaintiff is not entitled to the extraordinary and drastic remedy that he seeks, nor would that remedy cure the activities of third parties that are the true impetus of his Complaint.

# II. STATEMENT OF FACTS

**A.     Defendants Were Important Members of BOSTON.**[1]  Fran Cosmo was selected to join the band BOSTON in 1992 during the recording of BOSTON's 4th album.  *See* Declaration of Fran Cosmo ("F. Cosmo Decl."), ¶ 2.  He was the lead vocalist on that platinum BOSTON album entitled *Walk On*.  *Id.*  The *Walk On* album included a song that became his "signature song," entitled "Livin' For You."  *Id.*  The song held such importance within BOSTON that the entire 1995 tour was officially titled "The Livin' For You Tour."  *Id.*  Mr. Cosmo also had a large role on BOSTON's 2002 album *Corporate America*, where he provided lead vocals on four of the nine songs on the album, providing backup vocals on others, and was a co-producer of certain songs.  *Id.* at ¶ 3.  A live version of "Livin' For You," was included on *Corporate America*.  *Id.*  Aside from the *Greatest Hits* package, this was the only time BOSTON duplicated the inclusion of a song on a subsequent album and was the only live BOSTON recording ever released.  *Id.*  Two of the songs on which Fran was featured as lead vocalist were included on BOSTON's *Greatest Hits* album.  *Id.* at ¶ 4.  "Livin' For You" was included on the album's first release and then "I Need Your Love" replaced "Livin' For You" on the 2009 remix release.  *Id.*  Fran performed live on BOSTON tours from 1994 to 2004, sharing lead vocal duties with Brad Delp, even on songs that were originally recorded using only Brad Delp as vocalist.  *Id.* at ¶ 5.  Currently, Fran Cosmo performs with his son, Anthony Cosmo, under his own name, and also with a group called the World Classic Rockers.  *Id.* at ¶ 6.

---

[1] In Plaintiff's Complaint, he concedes that Defendants were, in fact, members of BOSTON.  Compl. at ¶ 16.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 1
Case No. 2:13-cv-01229 JLR

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON  98101-2338
206.223.7000 FAX: 206.223.7107

127776.0001/5781057.3

Anthony Cosmo began writing songs for Plaintiff in around 1999. Declaration of Anthony Cosmo ("A. Cosmo Decl."), ¶ 2. From 1999 to 2004, Anthony Cosmo wrote over a half a dozen songs for Plaintiff. *Id.* Three of those songs were recorded on BOSTON's *Corporate America* album. *Id.* Anthony Cosmo toured with BOSTON in 2003 and 2004 as a backing vocalist and guitarist. *Id.* He stopped working with BOSTON in 2006. *Id.*

Defendants do not contest that Plaintiff owns the trademark "BOSTON" (the "BOSTON Mark") or the BOSTON logo shown on page 4 of Plaintiff's Motion (the "BOSTON Logo" and together with the BOSTON Mark the "BOSTON Marks"). Defendants deny, however, that they have misused the BOSTON Marks in any way. Rather, as discussed below, Defendants have made fair use of the BOSTON Mark to accurately represent themselves as former members of the band of that name; and, they have actively, aggressively, and consistently dissuaded individuals and entities with whom they contract from engaging in misleading advertising or infringement of the BOSTON Marks.[2]

**B.      Plaintiff Has a Long, Litigious History of Suing Former Members of BOSTON to Prevent Them from Performing.** Plaintiff has an extensive litigation history that puts anyone associated with BOSTON at risk of litigation, including former BOSTON band members, their family members, managers, record labels, and even reporters who cover such goings-on. *See, e.g., Scholz v. Delp*, Nos. SUCV201004069, SUCV201001010, 2011 WL 6379306 (Suffolk. Super. Ct. Aug. 19, 2011), *rev'd*, 988 N.E.2d 4 (Mass. App. Ct. 2013) (accusing former lead singer's ex-wife of defamation); *Scholz v. Sony Music Ent., Inc.*, No. 1:93-cv-06824-LAK (S.D.N.Y. dismissed Feb. 24, 1998) (alleging breach of contract against Sony Music); *Scholz v. Goudreau*, No. MICV2009-02508 (Middlesex Sup. Ct. dismissed Oct. 13, 2009) (trademark infringement against original band member); *Scholz v. Boston Herald Inc.*, No. SUCV2010-01010 (Suffolk Sup. Ct. Mar. 11, 2010) (defamation against newspaper and reporters).

---

[2] Plaintiff alleges that before joining BOSTON, Defendants signed contracts wherein they acknowledged they had no legal or equitable right to use the name BOSTON and would not use the name after they left the band. *See* Motion at pp. 4-5. Defendants admit they signed the (now expired) agreements, but never agreed not to mention their former affiliation with BOSTON. Rather, they agreed not to use the BOSTON Marks *as trademarks*.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 2
Case No. 2:13-cv-01229 JLR

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON  98101-2338
206.223.7000 FAX: 206.223.7107

Plaintiff's litigious nature has been widely publicized. In 2003, *Rolling Stone* magazine described Plaintiff's "prolific" litigation history, and explained how Plaintiff's lawsuits "threaten[] to outnumber his album releases." Gil Kaufman, *Boston Sue Artemis: Scholz claims label under-publicized album*, ROLLING STONE, Jun. 25, 2003, available at http://www.rollingstone.com/music/news/boston-sue-artemis-20030625. *See* Declaration of Erin M. Wilson ("Wilson Decl."), Ex. A. At the time of the *Rolling Stone* article, Plaintiff had "revved up the litigation machine" again to sue his recording label for allegedly failing to promote a BOSTON album. *Id.* Plaintiff's litigation pursuits have also been chronicled in the *Boston Business Journal* and *Boston Magazine*. Wilson Decl., Exs. B and C.

Plaintiff's claims in this case are not new; he has been filing similar lawsuits for years. In 2006, Plaintiff filed a complaint against Defendant Anthony Cosmo in Massachusetts Superior Court, alleging trademark infringement claims similar to those alleged here. *Scholz v. Migliaccio*, No. SUCV2006-05923 (Suffolk Sup. Ct. filed Dec. 20, 2006). Anthony Cosmo was accused of breaching the "Band Participation Agreement" he entered into with Plaintiff after leaving the band. *Id.* Additionally, in a matter of four years, Plaintiff filed three lawsuits against one of the original band members, Barry Goudreau, for alleged trademark infringement. *Scholz v. Goudreau*, No. MICV2009-02508 (Middlesex Sup. Ct. Oct. 13, 2009); *Scholz v. Goudreau*, No. SUCV2010-04811 (Suffolk Sup. Ct. April 29, 2011); *Scholz v. Goudreau*, No. 1:13-cv-10951-DJC (D. Mass. filed Apr. 17, 2013) (hereinafter "*Goudreau 2013*").

Plaintiff's current trademark action against Goudreau alleges claims nearly identical to those alleged in this case. Plaintiff accuses Goudreau of using the BOSTON Marks in a way that "take[s] advantage of BOSTON's goodwill and esteem." *Goudreau* 2013, Dkt. No. 1 at ¶ 2.[3] Plaintiff also alleges that Goudreau's true statements regarding his past affiliation with the band are likely to promote confusion, mistake, or deception. *Goudreau* 2013, Dkt. No. 1 at ¶ 3.[4] Plaintiff argues that by mentioning his prior affiliation with the band, Goudreau "distracts"

---

[3] *Cf.* Complaint at ¶ 32 (Defendants allegedly "misappropriated Scholz's goodwill for their own benefit and commercial gain").

[4] *Cf.* Complaint at ¶ 33 (Defendants' use of the Boston Marks allegedly causes "confusion, mistake, and/or deception").

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 3
Case No. 2:13-cv-01229 JLR

127776.0001/5781057.3

concert goers from attending Plaintiff's concerts and purchasing his music, thereby diluting his trademarks. *Goudreau* 2013, Dkt. No. 1 at ¶ 2.[5]  In responding to the complaint, Goudreau denied the allegations, stating that Scholz has not sustained any damage, that any damage is a result of third party conduct, and counterclaiming for, *inter alia*, declaratory judgment and breach of contract. *Goudreau* 2013, Dkt. No. 7 at p. 13. Goudreau's counterclaim explains that upon Goudreau's departure from BOSTON, a settlement agreement gave him the right to use his past affiliation with BOSTON to promote his future music undertakings. Goudreau aptly explains the lawsuit as another example of Scholz's misuse of the BOSTON Marks "as a bludgeon to harass and intimidate [Goudreau] and other former members of the band." *Id.*

Defendants do not dispute that Plaintiff has a right to protect the BOSTON Marks and use the justice system to enforce those rights, but it appears Plaintiff is attempting to use time consuming and expensive litigation (or the threat thereof) to, at worst, prevent Goudreau and Defendants from fairly and accurately representing themselves and pursuing their careers; or at best, to force overly restrictive resolutions that go beyond the reach of the trademark law when his former bandmates cannot suffer the litigation.[6]

**C.    Plaintiff Has Repeatedly Interfered with Defendants' Performances and Imposed Improper Restrictions on Defendants' Ability to Promote Themselves.** Since Defendants stopped performing with BOSTON, Plaintiff has consistently complained about potential trademark infringement, while at the same time agreeing that Defendants may accurately represent themselves as former members of BOSTON.  *See* A. Cosmo Decl. at ¶ 5; Declaration of Carl Spagnuolo ("Spagnuolo Decl.") at ¶¶ 3-5, 11; Exs. A, C, and D.  For example, in

---

[5] *Cf.* Motion at p. 16 (alleging that "a real danger exists that consumer demand or appetite to purchase tickets to a true BOSTON concert will be adversely affected by the Cosmos' performances that are advertised and promoted in a misleading manner with the name BOSTON.")

[6] Plaintiff's repeated threats of litigation against former BOSTON members have been used to intimidate them from pursuing their musical careers. Plaintiff has sent former members "draft" complaints, and the mere threat of expensive, time-consuming litigation has forced these individuals to withdraw from performances. *Goudreau* 2013, Dkt. No. 7 at ¶ 43.  In 2007, shortly after the tragic death of one of the band's former lead singers, Brad Delp, Plaintiff brought a defamation suit against Delp's ex-wife. *Scholz v. Delp*, 2011 WL 6379306 (Suffolk Super. Ct. 2011), *rev'd*, 988 N.E.2d 4 (Mass. App. Ct. 2013).  Plaintiff alleged Ms. Delp tried to taint his reputation after providing the *Boston Herald* with information surrounding Mr. Delp's death.  In 2010, Plaintiff, not satisfied with only suing Ms. Delp, commenced an action against the *Boston Herald* for publishing allegedly defamatory articles. *Scholz v. Boston Herald Inc., et al.*, No. SUCV2010-01010 (Suffolk Sup. Ct . 2010).

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 4
Case No. 2:13-cv-01229 JLR

response to Plaintiff's 2006 trademark lawsuit, Anthony Cosmo called Plaintiff, and after explaining that he did not violate any trademark, Plaintiff dropped the lawsuit. A. Cosmo Decl. at ¶ 4.  Defendants have not changed their promotional practices since that time.  In 2008, Defendants' attorney was able to stop third party use of "Best of Boston" to Plaintiff's satisfaction. Spagnuolo Decl. at ¶ 4; Ex. A.  Then, in 2009, the parties agreed on promotional practices for Defendants to perform at Disney World. Spagnuolo Decl. at ¶ 11; Ex. C.

Since Defendants' departure from BOSTON, Plaintiff has continued to harass Defendants, and their promoters and venues, despite the fact that Defendants made every effort to ensure the BOSTON Marks were never misused.[7]  *See generally,* A. Cosmo Decl.; Spagnuolo Decl. at ¶¶ 5, 7-10; Ex. B. Plaintiff repeatedly called, wrote to, and threatened Defendants and their promoters and venues, arguing in effect that Defendants should not be able to accurately represent themselves as former members of BOSTON. A. Cosmo Decl. at ¶ 5.  As a result, Defendants have gone out of their way to require their promoters and venues to make limited use of the BOSTON Mark, and not to use the BOSTON Logo under any circumstance. *Id.*; *see also* Spagnuolo Decl., Ex. C at 4.  As one of many examples that will be revealed through discovery, in 2009, Plaintiff and his publicist threatened Defendants, demanding that they not use the phrase "FRAN COSMO former lead singer of BOSTON." A. Cosmo Decl., Ex. A.  As Anthony Cosmo explained in an e-mail to Plaintiff:

> I HAVE SAVED THE APPROVED POSTER FROM YOU AND SUE, IT SAID FORMER LEAD SINGER, I HAVE TAKEN OVER BOOKING THE BAND FOR A FEW SHOWS NOW I AM FEELING HEAT FROM SUE NOT TO SAY FORMER LEAD SINGER, I ALREADY CONTRACTED A FEW JOBS WITH THIS. I WILL LOSE THE JOBS THAT I WORKED THREE MONTHS ON TO GET I AM RELYING ON THIS TO GET ME THROUGH THE WINTER. I AM DEF NOT UP TO FALSE ADVERTISEMENT AND UNDERSTAND HOW TO ADVERTISE. I AM ONLY GOING BY WHAT WE WERE ALLOWED TO USE. ATTACHED IS THE POSTER. IF YOU

---

[7] Defendants' efforts extended even to rogue third parties with whom they never had any connection.  For example, the March, 2009 announcement of a "Boston show to entertain at I-90 Expo."  In that case, an entity unknown to Defendants published that "Former members of the legendary classic rock group Boston will perform at the I-90 Expo Center on Saturday."  Neither Defendants nor their representative had ever contracted for Defendants to appear at this event.  The event administrators posted this announcement despite it not being based in fact or truth.  Despite their having had nothing to do with the "I-90" promotion, Plaintiff accused Defendants of misusing the BOSTON Mark and caused Defendants the inconvenience of having to accomplish a retraction. *See* Spagnuolo Decl. at ¶ 7; Ex. B.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 5
Case No. 2:13-cv-01229 JLR

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

127776.0001/5781057.3

FEEL WE SHOULD TAKE FORMER LEAD SINGER OFF I WILL BUT PLEASE LET ME FINISH THE GIGS ALREADY CONTRACTED WITH FORMER LEAD SINGER, THEY SIGNED THEM ALREADY. WE USED THIS FOR ALL OF THE GIGS LAST SUMMER WITH YOUR APPROVAL. I NEED SOME HELP ON THIS PLEASE......ANT

This is just one example of Plaintiff changing his tune and providing Defendants with conflicting information about how they can advertise their shows.[8] In April 2010, Plaintiff's publicist went so far as to threaten legal action against a blogger promoting a Fran Cosmo show who simply referred to Fran Cosmo as the "former lead singer of BOSTON." *See* A. Cosmo Decl. at ¶ 8; Ex. B. Then, in July 2010, Anthony Cosmo emailed Plaintiff regarding an advertisement that Mr. Cosmo found through a Google alert that was perhaps not appropriate. A. Cosmo Decl., Ex. C. The advertisement was not promoted by any entity or individual even remotely connected to the Defendants, but nevertheless, Mr. Cosmo called the advertiser and was able to correct the advertisement. *Id.* at ¶ 9.

Further, on April 3, 2013, Plaintiff's attorney, Susan E. Stenger, wrote to Defendants' trademark attorney, Carl Spagnuolo, regarding a Texarkana, TX concert.[9] *See* Spagnuolo Decl. at ¶ 12; Ex. D. In that letter, Ms. Stenger demanded that Defendants agree as follows[10]:

- Any mention of the name Boston in any Fran Cosmo advertisement which is beyond a strict biographical nature, is strictly prohibited.
- The name Boston shall not be mentioned more than once in any piece of promotional material, including websites.
- Fran shall only be described as "Fran Cosmo, former lead singer for Boston,"
- The font size of Fran Cosmo must be significantly larger (and more prominent in ter[m]s of color, font, placement, etc.).
- The phrase "former lead singer of" must be clearly legible.
- The word Boston must appear in the same font size (and on the same line as) "former lead singer of."
- The proportions must reflect those shown in your letter, which is about a 2:1 ratio.
- The name Fran Cosmo must always appear first, and in the largest font size.

---

[8] Although Plaintiff cannot prevent Defendants from accurately referring to themselves as former BOSTON members (or referring to Fran as a former lead singer), he has so aggressively barraged Defendants with demands and threatened litigation so often that they have had no choice but to do their best to comply with his unrelenting demands. *See generally*, A. Cosmo Decl.

[9] It is worth noting that Defendants have had to retain a trademark attorney since 2008, just to keep up with Plaintiff's never-ending demands and complaints. *See* A. Cosmo Decl. at ¶ 10; *see also* Spagnuolo Decl. at ¶ 3.

[10] As explained below, Plaintiff's requirements are far more burdensome than required by law.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION - 6
Case No. 2:13-cv-01229 JLR

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

127776.0001/5781057.3

- No phrases allowed such as "Performing an all-hits Boston show".
- No use of the BOSTON logo under any circumstances.

Despite the over-reaching nature of Plaintiff's demands, Defendants nevertheless comply with the vast majority of the above constraints. *See* A. Cosmo Decl. at ¶ 10. Defendants only use the name BOSTON in a biographical way, consistently and legibly describe Fran as a "former lead singer for Boston," use a larger font for "Fran Cosmo" than for "Boston," place "Boston" on the same line as "former lead singer of," disallow the use of phrases such as "Performing an all-hits Boston show," and never use the BOSTON Logo. *Id.* Despite Defendants' voluntary compliance with these demands, this lawsuit and Motion were filed.

In May of 2013, Plaintiff's publicist contacted Brett Daniels, who was organizing a show for Defendants. *See* Declaration of Brett Daniels ("Daniels Decl.") at ¶ 3.   Mr. Daniels had booked Defendants for musical performances four times over the past few years. *Id.* at ¶ 2. In advertising their performances, he referred to them as the "Fran Cosmo Band" or as "Fran Cosmo former singer for Boston." *Id.*  Throughout his dealings with Defendants, Mr. Daniels had never had any trouble promoting their shows, until May of 2013, when Plaintiff's publicist, Gail Parenteau, called him and demanded that he remove the word "Boston" from promotional materials. *Id.* at ¶ 3.  Mr. Daniels asked her what was wrong with using "Boston" and she said that at no time were Anthony or Fran Cosmo officially in the band BOSTON, and therefore she demanded that Mr. Daniels not represent otherwise. *Id.*  Ms. Parenteau further told him that he would be sued by Mr. Scholz if he continued. *Id.*  Mr. Daniels informed Ms. Parenteau that to his knowledge, which was based on current Wikipedia pages, CDs, and the band BOSTON's own website (www.bandboston.com), it was clear that Fran and Anthony Cosmo are, in fact, former members of BOSTON. *Id.* at ¶ 4. Ms. Parenteau quickly hung up the phone and Mr. Daniels never heard from her again. *Id.*  In addition to such legal threats and damaging communications with venues, Ms. Parenteau also posted statements on various BOSTON fan web-sites trivializing Fran Cosmo's contribution to BOSTON and stating that Fran Cosmo was never a "lead singer" of BOSTON. *See* Spagnuolo Decl. at ¶ 10. Ms. Parenteau's activities

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 7
Case No. 2:13-cv-01229 JLR
127776.0001/5781057.3

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

were apparently on-going, even while the parties' attorneys were conducting supposedly good faith negotiations regarding appropriate promotional uses of the BOSTON Marks. *Id.*

**D.   Defendants Consistently Require Venues and Promoters to Appropriately Advertise their Performances.** Defendants make every effort to ensure clear advertising that accurately represents their former affiliation with BOSTON. When Defendants contract to perform concerts, they consistently supply the contracting party with a "rider" that explains precisely how the contracting party can advertise the performance. A. Cosmo Decl. at ¶ 11; Ex. E. The rider states that in "all advertising promotional material, including but not limited to: TV ads, radio spots, newspaper ads, posters, flyers and tickets; each and every usage" shall state "BOSTON former lead singer Fran Cosmo." *Id.* The font shall be such that BOSTON is in 50% font, "former lead singer" is in 25% font, and "Fran Cosmo" is the largest, in 100% font. Advertisements may also state: "Also featuring former BOSTON guitarist Anthony Cosmo." *Id.* The rider also states: "The intent is to make it clear that this is not a performance by Boston, but in fact a performance of the Hits of Boston, performed by its[] former players." *Id.* Defendants will not agree to any performance for which these strict rules are not agreed upon. *Id.* Indeed, Defendants have had to cancel performances where the contracting party advertised inconsistently with these specific advertising requirements.[11] *Id.* at ¶ 12.

**E.   Each of the Performances Discussed in Plaintiff's Motion Was Properly Advertised.** Plaintiff claims Defendants infringed on the BOSTON Marks when advertising a number of recent performances. *See* Motion at pp. 5-7. Plaintiff fails, however, to identify any instance in which *Defendants themselves* (or anyone under their control) engaged in any misleading or infringing activity whatsoever. Even more, Plaintiff fails to consider the lengths to which Defendants have gone to prevent any misleading advertisements or misuse of the BOSTON Marks. The below table addresses and refutes Plaintiff's allegations:

| Recent Performance | Plaintiff's Allegation | Defendants' Actual Conduct |
|---|---|---|
| Bellingham, | Plaintiff complains that "actual | Plaintiff offers no evidence whatsoever |

---

[11] Through discovery, Defendants' promoters and venues will confirm that Defendants repeatedly contact them and urge them to follow the terms of the rider.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 8
Case No. 2:13-cv-01229 JLR

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

127776.0001/5781057.3

| | | |
|---|---|---|
| WA | Facebook posts" discussing Defendants' Bellingham concert reflect that Defendants promoted the concert "in a way that confuses both the ticket-buying public and the concert venues or promoters into believing that the actual band BOSTON is playing." *See* Motion at p. 1. Plaintiff claims that a website described the concert as "BOSTON former lead singer FRAN COSMO" and that representatives of the music festival "have responded to phone inquiries from the public by stating, among other things, that BOSTON is performing at 8:00 P.M. on July 13th." *Id.* at p. 6. | that *Defendants themselves* (or anyone under their control) had anything to do with any purported confusion. Defendants cannot control every employee of every venue for every performance.  However, Defendants insisted on and received an agreement that the Bellingham concert would be advertised consistent with the requirements specified in Defendants' rider. *See* A. Cosmo Decl. at ¶ 12. |
| Texarkana, TX | Plaintiff alleges "Fran promoted his Texarkana concert, at which his son Anthony also performed, by referring to himself as "Fran Cosmo of BOSTON" and "BOSTON former lead singer Fran Cosmo." Plaintiff alleges that promotional posters for this concert also improperly used the name BOSTON in bold white letters, as the first word one reads, alone at the top of the page, while a local radio station allegedly advertised the concert on its website by using a video which improperly used the BOSTON logo and BOSTON album cover art, falsely suggesting that BOSTON was performing at the concert.  Motion at p. 5. | Defendants accurately referred to Fran Cosmo as the former lead singer of BOSTON. *See* A. Cosmo Decl. at ¶ 7; F. Cosmo Decl. at ¶ 2. Furthermore, Defendants insisted on and received an agreement that the concert would be advertised consistent with the requirements specified in Defendants' rider. A. Cosmo Decl. at ¶ 12. Indeed, the Perot Theater's webpage listed "FRAN COSMO" in large, bolded letters, following "Former Lead Singer of Boston" in small print. *Id.* at Ex. H. Defendants did not encourage or facilitate any radio station to use BOSTON album cover art or otherwise mislead the public as to who was performing at the Texarkana concert. *Id.* at ¶ 13. |
| Dubuque, IA | Plaintiff complains about Defendants' concert in Dubuque, Iowa. Specifically, Plaintiff claims the concert was described as the "Best of Boston" and that Fran was described as being "of the classic rock group Boston." Motion at p. 5. | Again, Plaintiff fails to identify how *Defendants themselves* (or anyone under their control) falsely advertised the Dubuque performance or misused the BOSTON Marks. Indeed, as is Defendants' practice, they required the venue to agree to the rider quoted above. *See* A. Cosmo Decl. at ¶ 12. Defendants specifically told the venue (a) it could not advertise their show as the "best of boston", (b) it could not use the BOSTON Logo, and (c) it could only use the express words, "FRAN COSMO FORMER LEAD SINGER OF BOSTON." *Id.* Despite repeated efforts to change |

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 9
Case No. 2:13-cv-01229 JLR

LANE POWELL pc
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

| | | |
|---|---|---|
| | | advertisements of third parties that were out of their control, **Defendants ultimately cancelled this show when the responsible third parties refused to comply with their express requirements for promotional materials.** *Id.*; Exs. F and G. |
| Reno, NV | Plaintiff also alleges that Defendants "are promoting their July 27th Reno, Nevada concert at the Boomtown Casino & Hotel through website advertising describing the concert as, e.g., 'BOSTON Former Lead Vocalist FRAN COSMO LIVE.'" Motion at p. 6. Plaintiff alleges that "'BOSTON' is displayed first and more prominently. Representatives for the Boomtown Casino & Hotel have also informed the public that BOSTON is performing on July 27, 2013." *Id.* | Once again, Plaintiff fails to show how *Defendants themselves* (or anyone under their control) improperly advertised the concert, misled the public, or improperly used the BOSTON Marks. As is their practice, Defendants insisted on compliance with their rider for all advertisements and promotions of the performance in Reno. *See* A. Cosmo Decl. at ¶ 12. |
| Elk Grove, IL | With respect to Defendants' performance in Elk Grove, Illinois, Plaintiff alleges that a representative for the venue informed the public that "the rock band BOSTON is performing." Motion at p. 6. | Again, Plaintiff fails to allege that *Defendants* had anything to do with the venue's statements to the public. Defendants cannot control every employee at every venue, and they specifically required the venue to agree to make it clear "that this is not a performance by Boston, but in fact a performance of the Hits of Boston, performed by its[] former players." A. Cosmo Decl. at ¶ 12; Ex. E. |

## III. ARGUMENT

**A.    Standard for Obtaining a Preliminary Injunction.** "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, caries the burden of persuasion." *See Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865 (1997) (per curiam) (emphasis in original). "The liberal policy for issuing permanent injunctions for intellectual property infringement upon adjudication does not apply to preliminary injunctions." *Gill v. Am. Mortg. Educators, Inc.*, Nos. C07-5229RBL, 077-5244RBL, 2007 WL 2746946, *3 (W.D. Wash. Sept. 19, 2007) (citing *Nintendo of America, Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032 (9th Cir. 1994), *cert. denied*, 115 U.S. 85 (1994)). "The purpose of preliminary injunctions is to preserve the status quo and avoid

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION - 10
Case No. 2:13-cv-01229 JLR

**LANE POWELL PC**
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

127776.0001/5781057.3

irreparable injury before adjudication." *Id.* (citation omitted). To obtain a preliminary injunction, a party "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365 (2008) (vacating preliminary injunction); *Small v. Operative Plasterers' & Cement Masons' Int'l Assn. Local 200*, 611 F.3d 483, 490 (9th Cir. 2010) (quoting *Winter*, 555 U.S. at 20); *Mirina Corp. v. Marina Biotech*, 770 F. Supp. 2d 1153 (W.D. Wash. 2011). Here, Plaintiff cannot establish any of these elements, let alone all of them.

**B.    Plaintiff Fails to Establish a Probability of Success on the Merits of His Claims.**

While the Complaint alleges additional causes of action, Plaintiff's Motion is based entirely on Plaintiff's trademark infringement claim. Plaintiff has not, and cannot, establish that Defendants infringed on Plaintiff's trademarks, and his Motion must therefore be denied.

      1.    <u>Defendants Do Not Dispute Plaintiff's Ownership of the Trademarks</u>. Defendants do not contest Plaintiff's ownership of the BOSTON Marks. However, Defendants deny they have ever improperly used the BOSTON Marks in any way. As discussed below, Defendants have not used the BOSTON Logo, and the Defendants' use of the BOSTON Mark constitutes nominative fair use and therefore is not trademark infringement.

      2.    <u>The "Nominative Fair Use" Defense Applies to Defendants' Use of the BOSTON Mark</u>. Plaintiff argues that the relevant test for trademark infringement here is whether "the Cosmos have used the name BOSTON to promote and advertise their rock concert performances [in a way that] is likely to cause confusion with Scholz's BOSTON Marks." Motion at p. 9. Plaintiff's analysis misses the mark. The relevant test is whether Defendants' use of the BOSTON Mark constitutes nominative fair use.[12] *See New Kids on the Block v. News America Pub., Inc.*, 971 F.2d 302, 308-09 (9th Cir. 1992).

      In *Cairns v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir. 2002), the Ninth Circuit explained the distinction between "classic" and "nominative" fair use:

---

[12] Plaintiff argues that the likelihood of confusion factors enumerated in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979) are relevant to this case. Defendants disagree with that analysis, but to be clear, Defendants expressly deny that their use of the BOSTON Mark is likely to cause confusion under *Sleekcraft*.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 11
Case No. 2:13-cv-01229 JLR

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

127776.0001/5781057.3

> [The] nominative fair use analysis is appropriate where a defendant has used the plaintiff's mark to describe the plaintiff's product, *even if the defendant's ultimate goal is to describe his own product*. Conversely, the classic fair use analysis is appropriate where a defendant has used the plaintiff's mark *only* to describe his own product, *and not at all to describe the plaintiff's product*.

*Id.* at 1151 (emphasis in original, expanding reasoning previously set forth in *Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796 (9th Cir. 2002)). "When a defendant uses a trademark nominally, the trademark will be identical to the plaintiff's mark, at least in terms of the words in question. Thus, application of the *Sleekcraft* test, which focuses on the similarity of the mark used by the plaintiff and the defendant, would lead to the incorrect conclusion that virtually all nominative uses are confusing." *Welles*, 279 F.3d at 801.  The *Cairns* court further noted "Only rarely, if ever, will a defendant choose to refer to the plaintiff's product unless that reference ultimately helps to describe the defendant's own product." *Cairns*, 292 F.3d at 1151, n.8. This determination of what the defendant is referring to when it uses the plaintiff's mark is a "threshold consideration" of the nominative fair use analysis. *Id.* at 1150.

The *New Kids* court identified important policy reasons for limiting trademark rights by allowing nominative fair use:

> [I]t is often virtually impossible to refer to a particular product for purposes of comparison, criticism, point of reference or any other such purpose without using the mark. For example, reference to a large automobile manufacturer based in Michigan would not differentiate among the Big Three; reference to a large Japanese manufacturer of home electronics would narrow the field to a dozen or more companies. Much useful social and commercial discourse would be all but impossible if speakers were under threat of an infringement lawsuit every time they made reference to a person, company or product by using its trademark.

971 F.2d at 306-07.  Because the *New Kids* court recognized it was not confronted with a case of "classic fair use case where the defendant has used the plaintiffs' mark to describe the defendant's *own* product," it defined a category of trademark cases involving "a non-trademark use of a mark – a use to which the infringement laws simply do not apply." *Id.* at 307 (emphasis in original).  If a mark happens to be "the only word reasonably available to describe a particular thing" then its use in that context "is fair [so long as the use] does not imply sponsorship or endorsement by the trademark holder." *Id.* at 308.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION - 12
Case No. 2:13-cv-01229 JLR

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

127776.0001/5781057.3

Here, it is undisputed that Defendants used the exact word "BOSTON" to describe themselves. It is also undisputed that they were, in fact, in the band BOSTON. It is also true that Defendants used the text "BOSTON" to describe their own performances, but using a mark for such a purpose is perfectly permissible. By describing themselves as former members of BOSTON, Defendants described not only themselves, but *also* the band BOSTON. Defendants' truthful statements inform consumers about their biographies and performance capabilities. "Prohibition of such truthful and non-misleading speech does not advance the Lanham Act's purpose of protecting consumers and preventing unfair competition; in fact, it undermines that rationale by frustrating honest communication between the [defendants] and their customers." *See Toyota Motors Sales, U.S.A., Inc. v. Tabri*, 610 F.3d 1171, 1176-77 (9th Cir. 2010).

Because Defendants clearly used "the plaintiff's mark to describe the plaintiff's product" and not "*only* to describe [defendants'] own product," Defendants have satisfied the 'threshold consideration' first defined in *Cairns*. Therefore, the nominative fair use analysis is the appropriate framework for determining whether or not Defendants' use of Plaintiff's trademark is permissible. *See Cairns*, 292 F.3d at 1151.

a. *Plaintiff Bears the Burden of Establishing that Defendants' Use of Plaintiff's Mark was Not Nominative Fair Use.* In *KP Permanent Make-Up v. Lasting Impression I, Inc.*, the Supreme Court unambiguously instructed that the Lanham Act always places the "burden of proving likelihood of confusion … on the party charging infringement." 543 U.S. 111, 118 (2004). Because a "finding of nominative fair use is a finding that the plaintiff has failed to show a likelihood of confusion as to sponsorship or endorsement," a defendant must now show only that it "used the mark to refer to the trademarked good." *Toyota*, 610 F.3d at 1182-83. In other words, defendants' use must meet *Cairns'* "threshold consideration." *See Cairns*, 292 F.3d at 1150. "The burden then reverts to the plaintiff." *Toyota*, 610 F.3d at 1183. Here, Defendants used Plaintiff's mark to describe, at least in part, Plaintiff's product (the band BOSTON). Therefore, the burden is now on the Plaintiff to show why, as a matter of law, Defendants' use does not meet all of the requirements of nominative

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 13
Case No. 2:13-cv-01229 JLR
127776.0001/5781057.3

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

fair use. Without shifting that burden, Defendants demonstrate below that their use of the BOSTON Mark falls squarely within the requirements of nominative fair use.

b. *The New Kids Three Element Test for Nominative Fair Use*. In the *New Kids* case, the music group the New Kids on the Block filed suit against two newspapers that used the "NEW KIDS" mark to identify the group in conducting public opinion polls regarding the group's popularity. The *New Kids* court thoroughly defined the nominative fair use defense and held that an accused trademark infringer is entitled to it if:

(1)   the product in question is not readily identifiable without use of the trademark;
(2)   only so much of the mark is used as is reasonably necessary to identify the product; and
(3)   the user has done nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*New Kids*, 971 F.2d at 308 (footnote omitted). After defining the test, the Ninth Circuit held the newspapers' use was fair. The newspapers met the first element because, the court found, it would be "no more reasonably possible [] to refer to the New Kids as an entity than it is to refer to the Chicago Bulls, Volkswagens or the Boston Marathon without using the trademark." *Id.* at 308. The second and third elements were satisfied, respectively, because the newspapers used no more than the plain text name of the group, and because nothing in the newspapers' announcements suggested joint sponsorship or endorsement by the group. The plaintiffs argued that because the polls were moneymaking enterprises (utilizing a '900 number' for voting), they traded directly off of the NEW KIDS mark, and were distinguishable from similar cases where, for example, a mechanic's use of the word "Volkswagen" in the advertisement for his repair shop was found to not be an infringing use. *Id.* at 307 (describing *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350 (9th Cir. 1969)) and 309. The court rejected the "moneymaking" distinction, holding "[while] the New Kids have a limited property right in their name, that right does not entitle them to control their fans' use of their own money." *Id.* Where, as here, the use does not imply sponsorship or endorsement, the fact that it "is carried on for profit and in competition with the trademark holder's business is beside the point." *Id.*

Since *New Kids*, the Ninth Circuit has consistently applied the nominative fair use test. In *Welles, supra*, the plaintiff appealed the district court's grant of summary judgment on its

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION - 14
Case No. 2:13-cv-01229 JLR

trademark and unfair competition claims. *Welles*, 279 F.3d at 799. The plaintiff's claims arose from (1) Welles' use of the trademarked terms "PLAYBOY" and "PLAYMATE" in the metatags of her promotional website; (2) the phrase "Playmate of the Year 1981" in the website's headline (as well as in various banner ads intended to be used as links to Welles' website); and (3) the abbreviation "PMOY 1981," repeated as a 'wallpaper' image on the website. *Id.* at 800. After explaining why the *New Kids* nominative fair use test should apply instead of the likelihood of confusion test, the court confirmed that of the uses listed above, the first two qualified as nominative fair use, but the third did not. *Id.* at 801-05.

Regarding the headline and banner advertisements on Welles' website, the Ninth Circuit approved the district court's analysis of the first element of the *New Kids* test, stating:

> [T]here is no other way that Ms. Welles can identify or describe herself and her services without venturing into absurd descriptive phrases. To describe herself as the "nude model selected by Mr. Hefner's magazine as its number-one prototypical woman for the year 1981" would be impractical as well as ineffectual in identifying Terri Welles to the public.

*Id.* at 802 (citation omitted). The Ninth Circuit summarily found the headline and banner advertisements also satisfied the second element of the nominative fair use test, as Welles only used "the trademarked words, not the font or symbols associated with the trademarks." *Id.* Regarding the third 'sponsorship' element, the court reasoned the use of the marks in the headline and banner ads did nothing other than "describe the title she received from [the plaintiff] in 1981, a title that helps describe who she is." *Id.* at 803.[13]

The application of the *New Kids* test in *Cairns*, *supra*, is also instructive. There, the executors of the estate of Diana, Princess of Wales, filed suit against Franklin Mint, a manufacturer of various collectibles bearing Diana's name and likeness. *Cairns*, 292 F.3d at 1144. The Ninth Circuit affirmed summary judgment in favor of the defendant based on nominative fair use. The court determined that Franklin Mint's use of Princess Diana's name and likeness should be analyzed under the nominative fair use test, because, even though it used Diana's name and likeness to refer to her as a person, Franklin Mint's "ultimate goal was

---

[13] Conversely, the *Welles* court found that Welles' use of the abbreviation "PMOY 81" did not qualify as nominative fair use because it was not necessary to describe her status. *Id.* at 804. However, the court remanded for a determination of whether the abbreviation qualified for trademark protection in the first place. *Id.* at 802.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 15
Case No. 2:13-cv-01229 JLR

to describe its own Diana-related products," thus meeting the doctrine's "threshold consideration." *Id.* at 1152-53. The court then turned to the *New Kids* test.

As in the cases discussed above, the *Cairns* court noted the relative absurdity of using trademark law to force a defendant to refer to "the English princess who died in a car crash in 1997" and thus held that "Princess Diana's person is not readily identifiable without the use of her name." *Id.* at 1153. In analyzing the second element, the court held that it was "doubtful whether Franklin Mint would be able to sell its [Diana doll] without prominent reference to Princess Diana" and therefore the use of her name was "reasonably necessary." *Id.* at 1154. The court observed that, if the defendant's ability to describe its product "depends on the description of the plaintiff's product, more use of the plaintiff's trademark is reasonably necessary to identify the plaintiff's product." *Id.* at 1154 (quoting *New Kids*, 971 F.2d at 308).[14]

Finally, regarding the third element, the court held that none of the advertisements suggested sponsorship or endorsement by the plaintiff, despite the defendant's urging for its customers to "Join with [defendant] to Continue Princess Diana's Important Work," and its description of its products being "authentic." 292 F.3d at 1155. The court concluded that Franklin Mint was doing nothing to suggest sponsorship by the plaintiff.

c.    *Defendants' Use of the BOSTON Mark Satisfies All Three Elements of the New Kids Test for Nominative Fair Use.* As discussed above, the first element of the nominative fair use test is met if the "'trademark also describes a person, a place, or an attribute of a product' and there is no descriptive substitute for the trademark." *Welles*, 279 F.3d at 802 (quotation omitted). It does not have to be the only possible way of describing the product: one might refer to "'the professional basketball team from Chicago,' but it is far simpler (and more likely to be understood) to refer to the Chicago Bulls." *New Kids*, 971 F.2d at 306; *see also*

---

[14] This was *not* a holding that defendant must be completely unable to describe its product without describing plaintiff in order to meet the "reasonably necessary" element. In making this point, the *Cairns* court distinguished an earlier nominative fair use opinion, *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407 (9th Cir. 1996). In that case, defendant used plaintiff's name in a commercial for a car aired during the NCAA basketball tournament. The commercial arguably drew an analogy between plaintiff being voted most outstanding player of the tournament three years in a row and defendant's product making a 'best buy' list three years in a row. According to the *Cairns* court, unlike Franklin Mint, the defendant in *Abdul-Jabbar* "would probably be able to sell its Oldsmobile Eight-Eight without any reference to the basketball star." *Cairns*, 292 F.3d at 1154.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 16
Case No. 2:13-cv-01229 JLR

127776.0001/5781057.3

*Welles*, 279 F.3d at 802 (holding the same for "Playboy"); and *Cairns*, 292 F.3d at 1152 (citing previous opinions holding same for "Volkswagen," "Boston Marathon," and "Chanel #5").

Here, while Plaintiff has the exclusive right to use the BOSTON Marks *as trademarks*, he cannot prevent Defendants from accurately representing their biographical history. Of course, Defendants could advertise themselves as "former members of an American rock band from a big city in Massachusetts that played a number of classic rock songs." But, it is far simpler (and indisputably accurate) to call themselves former members of BOSTON.

The second element of the nominative fair use test is met if Defendants only used so much of the mark as necessary to identify themselves. Here, Defendants could not use any less than the entire BOSTON Mark in order to identify themselves, and Defendants did not use the BOSTON Logo or lettering. Thus, Defendants only used so much of the mark as was reasonably necessary to identify the product. *New Kids*, 971 F.2d at 308.[15] The second element of *New Kids* is thus satisfied.[16]

The third element of the nominative fair use test requires that the user do nothing that would suggest sponsorship or endorsement by the trademark holder. *Welles*, 279 F.3d at 803 (quoting *New Kids*, 971 F.2d at 308). Just like in *Welles*, Defendants' use of Plaintiff's mark describes Defendants' prior work. "The nominative fair use doctrine allows such truthful use of a mark, even if the speaker fails to expressly disavow association with the trademark holder, so long as it's unlikely to cause confusion as to a sponsorship or endorsement." *Toyota*, 610 F.3d at 1177 (citing *Welles*, 279 F.3d at 803 n.26). Because **Defendants themselves**[17] have done "nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the

---

[15] To the extent Plaintiff argues Defendants are competitors of BOSTON, Defendants are no less entitled to refer to BOSTON by virtue of allegedly being competitors. The *New Kids* court noted "a soft drink competitor would be entitled to compare its product to Coca-Cola or Coke, but would not be entitled to use Coca-Cola's distinctive lettering." *New Kids*, 971 F.2d at 308 n.7.

[16] Importantly, many music fans do not know names of band members, thus it is imperative that Defendants represent that they were formerly in BOSTON to identify themselves. Without referring to themselves as such, Defendants are much less likely to book performances.

[17] *See* section (III)(C)(1), *infra*. *Defendants themselves,* and anyone under their control, have never suggested BOSTON's sponsorship or endorsement and have actively discouraged third parties from doing so. *See also* Spagnuolo Decl. at ¶¶ 5-8, 12-13 (regarding third party uses and Defendants' efforts to stop them).

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 17
Case No. 2:13-cv-01229 JLR
127776.0001/5781057.3

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

trademark holder," Defendants' use satisfies the third element and thus constitutes nominative fair use pursuant to *New Kids*. 971 F.2d at 309.

**C.     Plaintiff Has Not and Cannot Demonstrate Irreparable Harm.** As discussed above, the Supreme Court requires that a Plaintiff demonstrate that "he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Despite this requirement, Plaintiff suggests he is entitled to rely on the "presumption" of irreparable injury. *See* Motion at 15. While the Ninth Circuit has applied the presumption of irreparable harm in a trademark case decided after *Winter*, *see Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873 (9th Cir. 2009), that application is inconsistent with the Supreme Court's "characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22; *Salinger v. Colting*, 607 F.3d 68, 82-83 (2d Cir. 2010) (reversing preliminary injunction in part because district court presumed irreparable harm); *see also Mirina*, 770 F. Supp. 2d at 1160-62.

1.     <u>Plaintiff Only Argues that *Third Parties* Improperly Used Plaintiff's Marks</u>. In a footnote, Plaintiff asserts that he "should not be forced or required to seek out, identify, and institute a trademark infringement lawsuit against every venue, promoter, media outlet, etc. who publicizes these infringing materials but may instead seek to require the Cosmos to police these outlets."[18] Motion at p. 12 n.2. As such, Plaintiff asks the Court to impose a burdensome injunction on Defendants that requires them to take a level of responsibility for the actions of third parties that far outweighs their ability to influence those actions. Even if Defendants can achieve "take down" of a rogue third party post, they are not responsible for, nor could they ever track down all instances of "Internet residue." *See* Spagnuolo Decl. at ¶ 8. This issue, which Plaintiff relegates to a footnote, is of primary importance because it highlights the

---

[18] Plaintiff relies on *Brother Records, Inc. v. Alan Jardine*, 318 F.3d 900 (9th Cir. 2003). However, in *Brother Records*, the defendant himself was controlling the promotion of his performances and aggressively using the BEACH BOYS mark in ways that made audiences think the Beach Boys were actually playing. The defendant thought he was entitled to do this as a founding member of the band. Here, on the other hand, Defendants go to extreme efforts to try to get promoters whom they do not control *not* to use BOSTON in a way that overshadows their own names. Defendants are not driving the promotions and advertising as was the case in *Brother Records*. Additionally, *Brother Records* is procedurally distinguishable because it has been impliedly overruled on the grounds that the court improperly shifted the burden to defendant to prove no likelihood of confusion. *See Toyota*, 610 F.3d at 1183. The burden is properly plaintiff's, thus rendering the analysis suspect, at least.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 18
Case No. 2:13-cv-01229 JLR

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

127776.0001/5781057.3

inefficacy of the requested relief and precisely why a preliminary injunction should *not* be granted.

Plaintiff cites two cases to support burdening Defendants with the task of policing the live-music promotions industry. First, regarding *Color Me House, Inc. v. Discovery Communications, Inc.*, No. C12-5935 RJB, 2013 WL 1283806 (W.D. Wash. Mar. 27, 2013), Plaintiff points to the statement that "the burden … to control the use by [Defendant] and its licensees or agents of [the offending mark] should be on [Defendant]" and that the mark's owner should not be required to find and sue each third-party infringer. *Id.* at *9. But, Plaintiff omits the court's conclusion—that "the scope of the injunction should be narrowly targeted to actions by [Defendant], and any party over which [Defendant] has *control*, to eliminate use of the [offending mark] on advertisements and products *within their control*." *Id.* (emphasis added). The *Color Me House* court recognized that the defendant had a "commercial, perhaps contractual, relationship" with the distributor and third-party vendors not party to the action that gave it only a limited ability to prevent further violation. *Id.* at **9-10. As such, its order required defendant only to "use all *reasonable efforts* to stop any person or entity with which it has a business relationship, however attenuated, from using the mark[.]" *Id.* (emphasis added). In contrast, here, Defendants have already made all reasonable efforts to stop the venues and promoters for their performances from improperly using the BOSTON Marks. *See generally* A. Cosmo Decl.[19]

Moreover, Plaintiff's Proposed Order asks this Court to enjoin the widest range of parties allowed under Fed. R. Civ. Pro. 65 from using all but a few specific promotional terms, failing to recognize the reasonable and practical limitations of Defendants' ability to police the actions of the myriad third parties involved in the live-music promotional market. *See*

---

[19] Plaintiff states he "does not seek to prevent the Cosmos from performing at any of their upcoming concert appearances or from earning a living as musicians. Scholz merely seeks to limit the manner in which the Cosmos use the name "BOSTON" to promote their concerts so that confusion in the marketplace will be prevented. As evidenced by Scholz's proposed order, Scholz is also not seeking to prevent the Cosmos from mentioning their former affiliation with BOSTON, so long as they do so in a manner that does not further the confusion." Motion at p. 3, n.1. However, if the injunction Plaintiff seeks were entered, he would effectively prevent Defendants from performing and earning a living. Defendants have not referenced their former affiliation with BOSTON in any way that furthers confusion, and any further restrictions would effectively prevent them from referring to their affiliation with BOSTON in any way, thus severely limiting their promote-ability.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 19
Case No. 2:13-cv-01229 JLR

LANE POWELL pc
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

127776.0001/5781057.3

Spagnuolo Decl. at ¶ 6 (describing the industry as comprised of many different and separate component parts, each responsible for different aspects of the presentation of live music, typically unrelated to one another, and all self-interested). *Color Me House* counsels *against* imposing an injunction as broad and burdensome as Plaintiff requests, and the reasonable and extensive steps Defendants already (voluntarily) take to prevent improper use of Plaintiff's mark counsels against imposing an injunction at all.

Plaintiff also cites *Rick v. Buchansky*, No. 82 Civ. 3906(RJW), 2001 WL 936293 (S.D.N.Y. Aug. 16, 2001). In *Rick*, the court held Vito Balsamo—the former lead singer of the doo-wop group "Vito and the Salutations"—in contempt for failing to comply with an injunction requiring him to distance himself in promotional materials from that group. *Id.* at **1–4. Plaintiff notes that the court did so in part because Balsamo failed to "exert more influence over the promoters [of his new group] to insure that they advertised him correctly." *Id.* at *4. Several important facts distinguish *Rick* from this case. First, although Balsamo did not prepare the offending promotional materials himself, many of those materials were prepared by in-house promoters for his new group. *See id.* at *3. Balsamo's ability to exert influence over his own management was inherently greater than Defendants' ability here to influence third-party promoters. In addition, the *Rick* court noted that Balsamo had merely "complained" to other members of his new group about his being incorrectly advertised and that "[m]erely complaining does not demonstrate reasonable diligence." *Id.* at *4.

By contrast, Defendants always use a rider that outlines proper use of the BOSTON Mark, actively communicate with promoters to stress the importance of properly marketing their shows, and have gone so far as to cancel a performance when promotional materials were not appropriately changed.[20] A. Cosmo Decl. at ¶¶ 11-12. Defendants are already diligently exerting what influence they have to avoid misuse of the BOSTON Marks and should not be subject to an unduly burdensome injunction that requires them to police third parties and control and the entire Internet. *See* Spagnuolo Decl. at ¶ 8. As reflected in the opening

---

[20] Defendants contend that Plaintiff's goal is, in fact, to force Defendants to stop performing. Even if it is not, Plaintiff's unreasonable and aggressive actions in trying to force Defendants to police third parties has caused them to cancel shows and could eventually cause them to stop performing. A. Cosmo Decl. at ¶ 12.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 20
Case No. 2:13-cv-01229 JLR

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

127776.0001/5781057.3

paragraph of Plaintiff's Motion, Plaintiff seems to want Defendants to monitor and control every concert goer, every blog entry[21], and every employee at every venue where the Defendants perform. This is not only unreasonable, it is impossible.[22]

A preliminary injunction will not provide Plaintiff the relief he seeks. A preliminary injunction requires a showing that "irreparable injury is *likely* in the absence of an injunction," such that a defendant's harmful act must be halted immediately. *Winter*, 555 U.S. at 22. The logical corollary to this criterion is that a preliminary injunction is not warranted where the harm will continue at the hands of third parties despite the restraint on the enjoined defendant. *See Am. Int'l Group, Inc. v. Am. Int'l Airways, Inc.*, 726 F. Supp. 1470, 1482–83 (E.D. Penn. 1989) (denying motion for preliminary injunction in part because the wide use of a mark by third parties "weakened substantially" the argument that the injunction would prevent irreparable harm). Because of Defendants' limited ability to influence third-party promoters, the requested injunction will not serve to stop the harm Plaintiff is attempting to prevent. Only enjoining the Defendants from all performing activity could do so, and such a restraint would impose a burden radically outweighing the alleged potential harm to Plaintiff.

2.    <u>Plaintiff Has Not Been Harmed.</u>   Plaintiff offers no evidence whatsoever that any of Defendants' actions or uses of the BOSTON Mark have harmed him.  For example, Plaintiff fails to show that Defendants are not performing well, such that their performances are harming BOSTON's reputation. In fact, Defendants' performances may reengage BOSTON fans, increase BOSTON record sales, and turn younger listeners on to BOSTON's hits. Plaintiff's allegation that "consumer demand or appetite to purchase tickets to a true BOSTON concert will be adversely affected by the Cosmos' performances" is pure speculation.  *See* Motion at p. 16; *see New Kids*, 971 F.2d at 309 ("[while] the New Kids have a limited property right in their name, that right does not entitle them to control their fans' use of their own

---

[21] *See, e.g.*, Spagnuolo Decl. at ¶ 13 (a comedian posted on his own website, Mr. Scholz objected to the phrasing, and Defendants chased down the post to appease Mr. Scholz, despite not having anything to do with it).

[22] Should this court ultimately impose an injunction, it should look to Plaintiff's cited authority, *Color Me House*, as a model of an injunction that recognizes the limited control Defendants can reasonably exert over third-party promoters and venues.  Defendants reserve their right to argue the form of the Order, should the Court decide an injunction is necessary.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 21
Case No. 2:13-cv-01229 JLR

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

127776.0001/5781057.3

money."). Plaintiff also has not offered any evidence (specific or general) that, for example, BOSTON ticket sales have been low, merchandise sales have been low, BOSTON is having trouble booking shows, or BOSTON's performance fees have decreased. Plaintiff has offered no actual evidence that anything Defendants are doing is having any effect on him whatsoever. Even if Plaintiff had made such allegations, the *Mirina* court stated that "lost sales or business opportunities cannot constitute *irreparable* harm, because … even if they were difficult to calculate, they would still constitute monetary, measurable damages." 770 F.3d at 1162. (citations omitted; emphasis in original); *see eAcceleration Corp. v. Trend Micro, Inc.*, 408 F. Supp. 2d 1110, 1122 (W.D. Wash. 2006) (no possibility of irreparable harm because even if plaintiff "was ultimately successful on one or more of its [trademark infringement] claims, its interest may be protected (at least in part) by the recovery of money damages.").

Further, Plaintiff's claim that he "has built up considerable, valuable goodwill, which is symbolized by the BOSTON Marks" and that Defendants are ***somehow*** devaluing that goodwill through their use of the BOSTON Marks is simply not enough. Motion at p. 2. The law is well settled: where a plaintiff fails to submit "any proof beyond speculation as to its reputation or goodwill in the relevant market" the Court has "no basis on which to evaluate any intangible harm." *Mirina*, 770 F. Supp. 2d at 1162. Because Plaintiff has made only speculative claims about the harm to BOSTON's reputation or goodwill, he has not articulated a harm that would not be compensable. This is insufficient to demonstrate a likelihood of irreparable harm.

Finally, Plaintiff's lengthy delay in seeking injunctive relief contradicts any suggestion that he is suffering urgent, continuing, and irreparable harm. *See e.g., eAcceleration Corp.*, 408 F. Supp. 2d at 1122 (citing *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984)). Plaintiff moves for a preliminary injunction ***seven years*** after he first complained that Defendants were allegedly infringing on his trademarks. *See* A. Cosmo Decl. ¶ 4. Indeed, the parties' attorneys had been working amicably for five years, until Plaintiff retained new counsel. *See* Spagnuolo Decl. at ¶¶ 3-4, 7, 9, 11-13, and referenced Exhibits. Given the speculative nature of Plaintiff's allegations of harm and the incredible delay in bringing these claims, Plaintiff has not demonstrated that he is likely to suffer irreparable harm.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 22
Case No. 2:13-cv-01229 JLR

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

127776.0001/5781057.3

**D.     The Balance of Hardships Tips Sharply in Defendants' Favor.** Where a party moving for a preliminary injunction fails to show that they would prevail on the merits or that they will suffer irreparable harm, the balance of hardships has been found to favor defendants. *Cascade Fin. Corp. v. Issaquah Cmty. Bank*, No. C07-1106Z, 2007 WL 2871981, *17 (W.D. Wash. Sept. 27, 2007); *see also eAcceleration Corp.*, 408 F. Supp. 2d at 1122-23 (preliminary injunction denied where balance of hardships favored party facing loss of sales, name change costs, and the possibility of disruption with business partners over party providing no specific examples of the hardship that it might incur if the relief was not granted).

Here, Plaintiff has articulated no tangible harm and would suffer no undue hardship in continuing the status quo of the past many years. On the other hand, if the proposed injunction were entered, Defendants would suffer momentous harm, including a loss of performances and revenue and disruption of relationships with venues and fans— essentially a loss of their ability to pursue their careers and make a living. A. Cosmo Decl. ¶ 14.

**E.     An Injunction Will Harm the Public Interest.** Here, granting a preliminary injunction will have negative effects on numerous third parties, and as a result, the requested relief is not in the public interest. An injunction in this case would cause monetary harm to concert venues and their employees who are hosting Defendants' upcoming concerts. A. Cosmo Decl. ¶ 14. Moreover, courts have held that a general appeal to the "federal policy in favor of protecting the public against deception or confusion" is not sufficient to establish that a strong public interest in granting an injunction exists. *eAcceleration Corp.*, 408 F. Supp. 2d at 1122-23.

**F.     The Court Should Require a Substantial Bond.** Plaintiff not only seeks the extraordinary and drastic remedy of a preliminary injunction, but also attempts to avoid posting a bond or in the alternative requests the entry of only a "minimal bond." Motion at p. 22. While the court has discretion to set the amount of the bond, "[w]hen setting the amount of security, district courts should err on the high side." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000). In trademark cases, "bonds must reflect full costs" because trademark suits "often are characterized by firms' desire to heap costs on their rivals, imposing marketplace losses out of proportion to the legal merits." *Id.* While an error in setting bond too

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 23
Case No. 2:13-cv-01229 JLR

**LANE POWELL PC**
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

127776.0001/5781057.3

high is "not serious," "an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Id.*

In this case, the amount of the bond should at least cover the Defendants' costs of an immediate appeal to the Court of Appeals for the Ninth Circuit, *see* 28 U.S.C. § 1292(b). Because costs of such an appeal can exceed $100,000, bond should be at least this amount. Furthermore, the bond must be substantial, because this is precisely the type of case where Plaintiff is merely attempting to "heap costs on" the Defendants, so as to force them to enter into an otherwise unreasonable settlement to avoid expensive litigation.

## IV. PRESERVATION OF DEFENSES

By submitting this Opposition, Defendants do not waive any of their affirmative defenses and preserve their right to raise any and all available defenses. Specifically, Defendants preserve their right to assert all defenses available under Fed. R. Civ. Pro. 12(b), including but not limited to lack of personal jurisdiction, improper venue, and failure to state a claim upon which relief can be granted. In addition, Defendants specifically preserve their right to assert the affirmative defenses of laches and acquiescence, which appear to be applicable to Plaintiff's claims and may be further developed through discovery.

## V. CONCLUSION

For each of the foregoing reasons, Plaintiff's Motion should be denied.

DATED:  August 13, 2013

LANE POWELL PC

By *s/Gregory F. Wesner*
Gregory F. Wesner, WSBA No. 30241
Email: wesnerg@lanepowell.com
*s/Parna A. Mehrbani*
Parna A. Mehrbani, WSBA No. 41631
Email: mehrbanip@lanepowell.com
*s/Erin M. Wilson*
Erin M. Wilson, WSBA No. 42454
Email: wilsonem@lanepowell.com
Telephone: 206.223.7000
Facsimile: 206.223.7107
Attorneys for Fran Migliaccio (aka Fran Cosmo) and Anthony Migliaccio (aka Anthony Cosmo)

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION - 24
Case No. 2:13-cv-01229 JLR
127776.0001/5781057.3

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

## CERTIFICATE OF SERVICE

Pursuant to RCW 9.A.72.085, the undersigned certifies under penalty of perjury under the laws of the State of Washington and the United States, that on the 13th day of August, 2013, the document attached hereto was presented to the Clerk of the Court for filing and uploading to the CM/ECF system.  In accordance with their ECF registration agreement and the Court's rules, the Clerk of the Court will send e-mail notification of such filing to the following:

Ramsey M. Al-Salam
Email: RAIsalam@perkinscoie.com

Eric J. Weiss
Email: EWeiss@perkinscoie.com

Erik Paul Belt
Email: ebelt@mccarter.com

Nicholas W. Allen
Email: nallen@mccarter.com

DATED this 13th day of August, 2013, at Seattle, Washington.

s/*Janet Wiley*_____
Janet Wiley

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION - 25
Case No. 2:13-cv-01229 JLR

127776.0001/5781057.3

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON  98101-2338
206.223.7000 FAX: 206.223.7107